NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

04 JAN 22 PM 2: 30

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| G. A. ABBOTT; CHARLES P. GAINES, and ROBIN V. SPARKS | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| AMERICAN EXPRESS COMPANY and AMERICAN EXPRESS CENTURION BANK | ) ) ) ) |
| Defendants. | ) ) |

CV 02-PT-447-E

ENTERED
JAN 2 2 2004

FINDINGS OF FACT
AND CONCLUSIONS OF LAW

This cause comes on to be heard on plaintiffs' "Motion for Preliminary Approval of Settlement Agreement And For Order Directing Notice to the Class" filed on December 15, 2003. The court conducted a recorded hearing on January 12, 2004.

The parties agreed that one of the preliminary decisions the court is to make is whether it will certify this action as a class action.[1] The court has concluded that it will not so preliminarily decide. After the court announced that it would not give such approval to certification, the parties agreed that the hearing could be terminated. The court's decision is based upon the admitted initial conflict of interest which has continued and plaintiffs' failure to meet their burden of proving adequacy of representation. It developed during the hearing that there may be

---

[1] The proposed preliminary approval order which the plaintiffs have submitted contains provisions that state that all three plaintiffs are adequate and typical representatives and that all three should conditionally be designated as representatives. The same proposed order requests that all the plaintiffs' attorneys (including Douglas) be named as class counsel.

other reasons for denial of plaintiffs' motion in this regard such as (1) lack of charge card typicality and/or commonality with regard to plaintiffs Abbott and Gaines; and (2) the totally delayed purported "representation" of plaintiff Sparks and her lack of notice or knowledge that she even purports to have any capacity other than as a "class member." Both sides apparently conceded that Abbott and Gaines are not appropriate class representatives. Apparently the parties suggest that only plaintiff Sparks, who was added as a party on the same day that the subject motion was filed, is an appropriate class representative .

Facts[2]

Record and Related<br>Findings of Court

1. On January 14, 2002, a complaint was filed in the Circuit Court of Talladega County, Alabama as a purported class action on behalf of "All American Express Cardholders who have been charged any late fee, finance charge, or other charge ...." The sole named plaintiff was "G. A." Abbott. The sole attorney who filed said complaint was George C. Douglas, Jr., the husband of G. A. Abbott. Ms. Abbott's name appeared as Gypsy A. Abbott in the pertinent American Express documents. Mr. Douglas acknowledges that there was a conflict of interest ab initio in his and his wife's purported representation of a class. He also acknowledges that his hope was that the defendant American Express Company would seek an early settlement prior to any removal to federal court and, apparently, without any other representation of the class.

2. On February 20, 2002, the defendant removed the action to this court. On the same

---

[2]The facts consist of references to the record, the subject motion and attachments, statements and representations made at the hearing on January 12, 2004, and reasonable inferences drawn therefrom. The court also attaches hereto as Exhibit A pertinent excerpts from the January 12, 2004 hearing.

2

date, the defendant filed a "Motion to Dismiss and to Compel Arbitration."

3. On March 25, 2002, Joseph B. Mays, Jr. entered an appearance for the plaintiff but withdrew that appearance on April 3, 2002.

4. On April 4, 2002, the court conducted a recorded telephone conference during which it was discussed that "G. A." Abbott is Mr. Douglas's wife.

5. At some point in 2002, Mr. Douglas had an informal discussion, at a docket call, concerning this case with his friend and former law partner Charles P. Gaines. Mr. Gaines had not contacted Mr. Douglas about representing him.

6. On May 21, 2002, another group of attorneys appeared for the plaintiff. By April 24, 2003, all these attorneys had withdrawn.

7. Charles P. Gaines was added as a party plaintiff on May 31, 2002. He testified that Mr. Douglas called him after their earlier referenced discussion and asked to add him as a plaintiff.[3] As indicated, Gaines was the former law partner and still friend of Douglas.

8. On April 24, 2003, James Walter, Jr., Christopher Weller, and Wyndall Ivey appeared as attorneys for the plaintiff. At this point, G. A. Abbott was still the only named plaintiff. Douglas remained as one of plaintiff's lawyers.

9. On December 11, 2003, Frank McFadden (with the same firm as the lawyers who appeared for plaintiff on April 24, 2003) appeared for the plaintiffs Abbott and Gaines.

10. On December 15, 2003, the subject motion and an amendment naming, for the first

---

[3]At the January 12, 2004 hearing plaintiffs' attorney McFadden referred to an anti-solicitation rule. This court does not further address that issue. Notwithstanding Mr. Gaines's position that he was not solicited, his testimony suggests that after he informally discussed this case with Douglas, Douglas called him. He did not seek Douglas out as an attorney to represent him.

time, Robin V. Sparks as a plaintiff was filed. They were signed by McFadden and Walter, Jr..
Douglas stated that he filed them. The subject motion contained the proposed previously
negotiated settlement agreement of which approval is sought. Sparks had no significant role in
the negotiated settlement. She first met the present plaintiffs' attorneys other than Douglas after
December 15, 2003 when they had a meeting to prepare for the January 12, 2004 hearing. She
testified that she considered Douglas to be her lawyer and that she considered herself to be
merely "a member of the class." Sparks is an attorney who practiced law with Douglas for a
brief period. Attorney Bruce F. Rogers, who has signed an affidavit in support of thesubject
motion, referred Sparks to Douglas.[4]

Further Findings of Fact

1. The proposed settlement calls for a payment by defendants of $4,100,000.00. The
average provided for payment or credit per class member would be 43¢ ($0.43). This amount
could be changed depending on the attorney fee award and payments to plaintiff
representative(s).

2. The cost of notice to the class is estimated to be $3,000,000.00. This may or may not
be only the cost of initial notices, not later notices and other administrative expenses.

3. The court does not deem the proposed equitable relief to be substantial. It primarily
confirms present obligations of the defendants.

4. The proposed agreement provides for attorney fees not to exceed $1,500,000.00 and
"incentive" awards to plaintiffs not exceeding $10,000.00. The proposed amounts, capped at

---

[4]It is apparent that Sparks was a last minute addition so as to provide a "straw" "representative" to replace
Abbott and Gaines. The plaintiffs' attorneys felt the need to add another "representative" either because of a conflict
of Abbott and Gaines or because Abbott and Gaines could not be representatives of card charge holders, or both. In
any event, Sparks's status as a "representative" is nominal.

4

$1,510,000.00, would be paid out of the proposed settlement award, which could reduce the class members' share to $2,590,000.00. Thus the payments to attorneys and representative(s) could be as much as 58% of the amount paid to class members.[5] The total amount paid to class members could be approximately 36% of the total payments by defendants including costs of notices.[6]

5. The proposed attorney fees would apparently be premised on the total $4,100,000.00 even if some of the amount is paid to charities rather than to class members. The plaintiffs' attorney experts (who are members of the same law firm) have been involved in several cases with Mr. Douglas. As indicated, Mr. Rogers referred Ms. Sparks to Mr. Douglas.

6. This court will not base any decision on matters negotiated in another case involving a different class.

7. Douglas and the other plaintiffs' attorneys have agreed to an attorney fee split whereby Douglas could receive as much as 50% of the attorney fees. Douglas has selected all associated attorneys in the case.

<u>Conclusions of Law</u>

The court notes the following statements in *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246 (11th Cir. 2003).[7]

> After filing the present lawsuit as counsel for London, Ader moved his brokerage account so that London was no longer his stockbroker.

---

[5]The court realizes that these amounts are subject to court approval, but the amounts negotiated have relevance to the conflict of interest issue.

[6]As indicated there could be other administrative costs to defendants. Footnote 5 of the hereinafter cited case of *London v. Wal-Mart* could have a bearing here.

[7]The court is of the opinion that *London* is controlling here. This judge had expressed concerns about the conflict and adequacy of representation even before *London* was published. The facts of this case seem more extreme than those in *London*.

*Id.* at 1253.

. . . .

   Another purpose of the adequacy inquiry is "to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625-26, 117 S.Ct. at 2250-51; *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812, 105 S.Ct. 2965, 2974, 86 L.Ed.2d 628 (1985) (noting that adequacy of representation is essential to protect due process rights of absent class members); *Gen. Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 331, 100 S.Ct. 1698, 1707, 64 L.Ed.2d 319 (1980) (noting that "the adequate-representation requirement is typically construed to foreclose the class action where there is a conflict of interest between the named plaintiff and the members of the putative class"); *Prado-Steiman ex rel Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000) (noting that the "incentives" of the class representative must "align with those of absent class members so as to assure that the absentees' interests will be fairly represented") (internal quotations omitted).

*Id.*

. . . .

   ...The court further stated that "[a]dequacy is for the plaintiffs to demonstrate; [the plaintiffs are not entitled to any] presumption of adequacy."

*Id.* (Footnote omitted).

. . . .

   This court has noted that "basic consideration of fairness requires that a court undertake a <u>stringent and continuing examination</u> of the adequacy of representation by the named class representative[] at all stages of the litigation where absent members will be bound by the court's judgment." *Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371, 1374 (11th Cir. 1984) (holding that, where named plaintiff was employee of class counsel, district court did not abuse its discretion by denying class certification). (Emphasis added).

   In *Susman v. Lincoln Am. Corp.*, 561 F.2d 86 (7 th Cir. 1977), the Seventh Circuit found that <u>one of the named plaintiffs</u> was an inadequate representative because his brother was class counsel. 561 F.2d at 95. The court noted that even though a plaintiff is not entitled to share in the attorney's fees, a plaintiff might still be motivated to maximize the attorney's fee where there is a close relationship between the plaintiff and the attorney. *Id.* The Seventh Circuit explained that "[c]ourts ... fear ... the danger of champerty [when there is a] close relationship

between the putative class representative and counsel." *Id*. at 91. (Emphasis added).

> The requirement for a stringent examination of the adequacy of the class representative is especially great when, as in this case, the attorney's fees will "far exceed[]" the class representative's recovery. *See Schroder*, 729 F.2d at 1375.[8]  In such circumstances, "courts fear that a class representative who is closely associated with the class attorney [will] allow settlement on terms less favorable to the interests of absent class members." *Id*. (Emphasis added).
>
> Thus, in this case, the district court was required to "undertake a stringent ... examination of the adequacy of representation by the name class representative []." *See id*. at 1374.  However, the district court merely pointed out that London was no longer Ader's stockbroker.

*Id*. at 1254-1255.  (Footnote omitted).

> ... The close relationship between London and Ader creates a *present* conflict of interest-an incentive for London to place the interest of Ader above those of the class. Furthermore, even though London is no longer Ader's stockbroker, nothing prevents his returning to that role after this litigation is concluded. If London plans to do so, London would have an additional incentive to increase Ader's fees at the expense of the class.  Thus, combined with their close friendship, the former financial relationship between London and Ader creates a *potential* conflict of interest.
>
> In summary, because the personal *and* financial ties between London and Ader are very close, and because Ader's recovery will vastly exceed what any of the class members will receive, we conclude that London cannot fairly and adequately represent the class.

*Id*. at 1255.

This court also further calls attention to Footnote 5 in *London* which may have application in view of the costs of notice, etc.

The court notes that *London* does not just refer to actual conflict but to potential conflict.[9]

---

[8]In this case, compare 43¢ average per member to $1,510,000.00.

[9]Rule 23(a) states that "one or more members of a class may sue or be sued as representative parties on behalf of all only if ... (4) the representative parties will fairly and adequately protect the interests of the class." (Emphasis added). These provisions require adequacy of representation before a suit can be filed or, at least, at the time it is filed.  (Emphasis added).

*London* also states:

> "Among the prerequisites to the maintenance of a class action is the requirement of Rule 23(a)(4) that the class representatives 'will fairly and adequately protect the interest of the class.'" *Lyons v. Georgia-Pacific Corp. Salaried Employees Ret. Plan*, 221 F.3d 1235, 1253 (11th Cir. 2000). The Supreme Court has noted that this requirement applies to both the named plaintiff and counsel. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n. 20, 117 S.Ct. 2231,2251 n. 20, 138 L.Ed.2d 689 (1997). This court has explained that the requirement's purpose is to "protect the legal rights of absent class members":

> > Because all members of the class are bound by the res judicata effect of the judgment, a principal factor in determining the appropriateness of class certification is the forthrightness and vigor with which the representative party can be expected to assert and defend the interest of the members of the class.

*Id.* at 1253 (citation omitted). (Emphasis added).

There is no indication here that any purported class representative ever had any interest whatsoever independent of that of Douglas.

This court calls attention to the pertinent discussions from secondary sources. *See* J. Russell Jackson, *Adequacy Requirement*, 26 NAT'L L. J. 18 (Oct. 20, 2003); 6 HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 21:5 (4th ed. 2003).[10]  The court particularly calls attention to the discussions regarding conflict of interests, duties of class representatives with reference to class members, etc.

---

[10]The court will not recite all the pertinent observations in these secondary sources but does note the following:

> Indeed, one of the "central purposes" behind the adequacy-of-representation requirement is to avoid situations in which "the named plaintiff is 'simply lending his name to a suit controlled entirely by the class attorney.'" *Frelin v. Oakwood Homes Corp.*, 2002 WL 31863487 (Ark. Cir. Ct. Nov. 25, 2002). The class "representative" is more than a legal fiction he or she is an actual person with fiduciary responsibilities that include protecting absent class members against the possibly competing interests of class counsel."

*See* J. Russell Jackson Adequacy Requirement, 26 NAT'L L.J. 18 (Oct. 20, 2003).

## SUMMARY

This court will rule on the one present issue before the court.  It will not give preliminary approval to certifying a class.

This the 22nd day of January, 2004.

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**

9

**EXHIBIT A**


| | |
|---|---|
| G. A. ABBOTT; CHARLES P. GAINES, ) | |
| and ROBIN V. SPARKS                )| |
| )| |
| **Plaintiffs,**                 )| |
| )| |
| v.                                     )| CV 02-PT-447-E |
| )| |
| AMERICAN EXPRESS COMPANY  )| |
| and AMERICAN EXPRESS          )| |
| CENTURION BANK                  )| |
| )| |
| **Defendants.**                )| |

**Excerpts from January 12, 2004 Hearing Transcript**

**Testimony of Plaintiff Abbott**

    Q.  Are you married to Mr. Douglas?
    A.  Yes, sir.
    Q.  And he's the attorney -- the plaintiffs' attorney in the
case; is that correct?
    A.  Yes, sir.

   . . . .

    Q.  Was there a Fed-Ex that was sent with directions to
deliver it on Christmas Day?
    A.  Well, yes, sir, because that is the due date of our
billing cycle.

   . . . .

    Q.  No.  I'm just asking you, was there any discussion between
you and your husband about sending that Fed-Ex so that it would
be received on Christmas Day?
    A.  We didn't talk about it being received on Christmas Day,
we just talked about it being there on the due date of our
bill.
    Q.  Who mailed the Fed-Ex?
    A.  My husband.

. . . .

Q.  Do you know what the agreement is in this case as far as attorneys' fees are concerned?
A.  I don't understand too much about class action law so I have some vague idea.  But I don't have any clear idea because my understanding is that's all dependent on the discretion of this Court.
Q.  Do you have any understanding as to how the attorneys' fees are to be shared between the attorneys?
A.  No, sir.
Q.  Has that been discussed?
A.  Not around me.  I mean --
Q.  Do you know the terms of the settlement?
A.  Not in any detail.  I know that American Express is interested in settling with this side.  That's all I really know.
Q.  Do you know the terms of the settlement?
A.  Sir?
Q.  I said, do you know the terms of the settlement?
A.  Could you tell me what you mean by "terms" to be sure I answer right?
Q.  The agreement.  What the nature of the agreement is, what the agreement is?
A.  No, sir.

. . . .

Q.  Do you know what amount would be the most amount any purported member of this class would receive if this settlement is approved?
A.  No, sir.
Q.  Do you have any idea?
A.  No, sir.
Q.  Do you know what the attorneys' fees would be?
A.  No, sir.
Q.  Do you know from what source the attorneys' fees would be paid?
A.  Well, I assume American Express.   I don't know that for sure.  That seems logical.
Q.  Do you know what the average amount of any class representative would receive?
A.  No, sir.

. . . .

Q.  Do you know how it came to be that Mr. Gaines was
purported to be added as a representative in this case?
A.  I don't know the details of that.
Q.  Ma'am?
A.  I do not know the details of that.
Q.  Did you make that suggestion?
A.  No, sir.

. . . .

Q.  (By the Court)  Did you ever have any input into the
 negotiations or anything related to it?
A.  No, sir.

. . . .

THE COURT:   Do you know how the name shows on the
American Express account?
THE WITNESS:   It shows Gypsy on there.

. . . .

**Testimony of Plaintiff Gaines**

Q.  How did you happen to become a class representative?
A.  Subsequently he called me and said would I be interested
in being a class member.
Q.  So, you were solicited?
A.  No.  We were talking about --
Q.  I understand.  He called you and asked you to be a class
 representative, was that not solicitation?
A.  It's during the conversation of my experience because he
asked me about it, when did it happen, what was it, was it a
late fee or interest charge or what?  And I told him, I again
said, I wasn't happy with it.  It bothered me.
Q.  But you didn't go to him and say, I want you to represent
me?
A.  No, sir.  I wouldn't say that I asked him to let me be a
class representative or be a member.  I didn't asked to be a
member, no, sir.

. . . .

Q.  Mr. Gaines, you have indicated that you had this
discussion with Mr. Douglas and you told him that you had a
similar problem?
A.  Yes, sir.
Q.  And later he called you and asked you if you'd be a class
member?
A.  Yes, sir.  I had told him if I could help, let me know,
and he called to ask about my experience.
Q.  But when you were having this discussion with him at the
docket call, did you say, would you represent me?
A.  No, sir, I didn't.  At that time, I didn't say that.

. . . .

A.  No, sir.  To any class representatives, total.
Q.  Okay.  In other words, the agreement provides for the
possibility of up to $10,000.00 to the three class -- purported
class representatives?
A.  Yes, sir.  Subject to the Court's approval.

. . . .

BY THE COURT:
Q.  Mr. Gaines, did you have anything to do with the
determination that the firm of Johnston-Barton would be
involved in this case?
A.  No, sir.  I had contact with them but I didn't select
them.
Q.  Did you have anything to do with the selection of Capell &
Howard?
A.  No, sir.
Q.  Did you participate in the negotiation of the settlement?
A.  Not directly.  But indirectly, I feel I did.

. . . .

Q.  Do you know what the most any purported member of the
class would receive under this proposed settlement?
A.  Well, I don't think it can be computed.  I understand
roughly a dollar, possibly give or take some change.  But it's
not going to be -- it certainly won't be more than two dollars,
I wouldn't expect.
Q.  In other words, no class member would get more than two
dollars?

A.  I don't think so because of the number of class members.
Q.  So, you think it would either be a dollar plus change or as much as two dollars?
A.  When I say as much as two dollars, I think it depends on how many class members.

. . . .

BY THE COURT:
Q.  How long have you known Mr. Douglas?
A.  Probably fifteen years.
Q.  Did you all have any acquaintance before he came into your law firm?
A.  Yes, sir.  He worked on some cases that our firm had been involved in for a cooperative.

. . . .

**Testimony of Plaintiff Sparks**


Q.  Okay.  How did it happen to be that you came to be considered a possible class representative in this case?
A.  It was strictly by coincidence.  I played tennis with Bruce Rogers' wife and sometime this summer--
Q.  You played tennis what?
A.  With Bruce Rogers' wife, Kim Rogers.  And sometime this summer, she had mentioned that he was just, in passing, that he was in a case involving the payment of late charges for credit cards and that had just happened to me.  And I said, it's so irritating when that happens and we just kind of talked about it.
Q.  Is that Mr. Rogers who has offered an affidavit in this case with regard to attorneys' fees?
A.  Yes, sir.

. . . .

...Then I guess Bruce called me and said, you know, what company was it with?  And I said, American Express.  And so he looked at my card to see if I was even a member or whatever and it proceeded from there.
Q.  Well, now, when you say it proceeded from there, what was the next thing that occurred?
A.  I think I gave Bruce my credit card and then he gave it to

George and he had said George Douglas was involved and I would
hear from him and I heard from George and gave him my card, a
copy of my card, to see if it was even the right one.

Q.  And when was this?

A.  I guess it was late summer of this past year.

Q.  And did you, at some point, ask Mr. Douglas to represent
you?

A.  I did not ask him to represent me, specifically.  I mean,
I said, yes, if I could be a member of the class, I would like
to be a member of the class.

Q.  But not to be a representative?

A.  I wasn't even paying attention as to what a representative
versus a member of the class was.

. . . .

A.  Just in talking with George Douglas about being involved
in the case.

Q.  Did you ever say to Mr. Douglas, I want you to represent
me?

A.  Not in those words.

Q.  Well, as an attorney, do you consider him to be your
lawyer?

A.  Yes.

Q.  Mr. Douglas to be your lawyer?

A.  Yes.

Q.  Just to do whatever he thought was best; is that right?

A.  On behalf of the class, of what he was representing of
which I assumed I was a member.

Q.  So, you considered yourself a member of the class?

A.  Yes.

Q.  Have you considered yourself a representative of the
class?

A.  Yes.

Q.  Did you participate in any negotiations in this case?

A.  No, sir.

Q.  Do you know what the purported settlement is?

A.  Yes, sir.

Q.  How did you learn that?

A.  I was given a copy of the settlement and the pleadings.

Q.  After it had been written?

A.  By the time I got it, it was after it was written.  And
then I was advised by Mr. Douglas of what was going on.

. . . .

Q.  Did you all have a meeting to discuss this, was that the
reason you were together?
A.  Yes.  To be able to answer any questions about potential
testifying.
Q.  Did you know Mr. Douglas at all before Mr. Rogers arranged
for you to talk to him?
A.  By total coincidence, we had been in a law firm together
back in like 1984, when I was practicing law.
Q.  Where?
A.  Najjar-Denaburg.  But had not had a conversation, hadn't
even thought about it since, I guess, like fifteen years.
Q.  Do you know at what point you said to Mr. Douglas or
anybody else -- have you ever had any conversation with anybody
at the Capell-Howard firm?
A.  No, sir, not to my knowledge.
Q.  Have you ever had any conversation whatsoever with any
attorney at the Capell-Howard firm in Montgomery?
A.  I don't know who is at the Capell-Howard firm.
Q.  You don't who that is.  Okay.

THE COURT:  Mr. Gaines, have you ever had any
conversation with any of them?
MR. CHARLES GAINES:  Judge, I don't think so.
THE COURT:  All right.  Ms. Abbott, have you ever
had any conversations with any member of the firm of Capell &
Howard?
MS. G.A. ABBOTT:  Not until we met.  But I have
talked -- well, I talked -- I mean, I don't think so.  They
may have come to the house but...
THE COURT:  All right.

BY THE COURT:
Q.  Do you know who represents you?
A.  George Douglas.
THE COURT:  Okay.  Any other questions?
MR. DOUGLAS:  I have just a couple, Your Honor.
THE COURT:  All right.


EXAMINATION


BY MR. DOUGLAS:

Q.   Robin, you had one with Frank McFadden?
A.   Yeah, I just don't know who's at the Capell-Howard law
firm.  That's why I wasn't sure about that.
Q.   You have met Frank McFadden?
THE COURT:   Where?
THE WITNESS:   Two weeks ago.
THE COURT:   Oh, y'all got together.  Is that the
first time you met him?
THE WITNESS:   Yes, sir.
BY MR. DOUGLAS:
Q.   And you met Mr. Walter?
A.   Yes.


. . . .


MR. DOUGLAS:   That's all, Your Honor.
THE COURT:   Ms. Sparks, let me ask you one more
question.  Do you have any understanding with regard to
receiving any compensation or amount over and above 43 cents or
a dollar or two dollars, whatever a class member might get?
MS. ROBIN SPARKS:   Yes, sir.   I understand there
may be some fee involved but not any amount.
THE COURT:   You understand that you might get some
compensation over and above what a class member would get; is
that correct?
MS. ROBIN SPARKS:   Yes, sir.

### Representations and Statements
### of Attorneys and Comments of Court

MR. DOUGLAS:  I guess my point is this.  I'm familiar
with the Wal-Mart case.  We actually came today to suggest to
the Court that neither my wife, nor Charlie Gaines, be named as
a representative.


. . . .


THE COURT:   Who made the arrangements with Ms.
Wheeler?
MR. DOUGLAS:  I did, Your Honor.  I'll represent
that I did.


. . . .


Q.   Do you recall discussing, associating Mr. Walter and Mr.

McFadden's firm?
A.   Yes, sir.

THE COURT:   At whose recommendation?
MR. DOUGLAS:   Again, mine.  I would represent that.
No question.

. . . .

MR. DOUGLAS:   But if it will save you time, Judge,
I'll represent to you, I knew that was a conflict when I filed
the case, you know.
THE COURT:   You knew it was a conflict when you
filed the case?
MR. DOUGLAS:   Absolutely.

. . . .

THE COURT:   At any rate, you knew when you filed the
case there was a conflict of interest.
MR. DOUGLAS:   Absolutely.

. . . .

THE COURT:   So you filed a case in Talladega circuit
court where you practiced law?
MR. DOUGLAS:   Actually, I filed it there because I
assumed they would remove it but I wanted to give American
Express time to take a look at the case and see whether they
wanted to do something early, rather than later.  There was no
particular -- I could have filed it in Jefferson County Circuit
Court.
THE COURT:   So, you filed it there with the idea
that they might want to settle it earlier; is that right?
MR. DOUGLAS:   I thought that they had a serious
issue as to posting payments.
THE COURT:   No.  You filed it in Talladega circuit
court because you thought that they might want to settle it
early?
MR. DOUGLAS:   Absolutely.

. . . .

THE COURT:   Okay. I think I had asked her if you all
had discussed from the beginning that there was a conflict and

both of your answers I guess was "yes".
MR. DOUGLAS:  Sure.  Yes, sir.

. . . .

THE COURT:  Have you ever been out of the case, Mr.
Douglas?
MR. DOUGLAS:  No, sir.

. . . .

THE COURT:  Is there a written agreement between you
and the Capell firm?
MR. DOUGLAS:  In the sense of an e-mail, there is.
Yes, sir.
THE COURT:  What is the percentage range it calls
for?
MR. DOUGLAS:  Well, it could be as low as 60% to
them and Johnston-Barton to as high as 50% percent.
THE COURT:  No.  What percentage to you?
MR. DOUGLAS:  Well, that's what I say.  It would be
as low as 40% to me, as high as 50% to me.  It depends on how
the amount --
THE COURT:  What is the arrangement between you and
Capell-Howard?
MR. DOUGLAS:  That is the arrangement.
THE COURT:  What?
MR. DOUGLAS:  A low of 40% to me or a high of 50%
depending on whose time gets allocated and who puts in the most
time.

. . . .

THE COURT:  What was Ms. Abbott's name on the
account with American Express?
MR. DOUGLAS:  You will see on the account that it's
listed in my name.  Her card was "Gypsy A."

. . . .

MR. DOUGLAS:  And I did that by when Mr. Gaines and
I were discussing this case at a docket call in Talladega one
day.  He said, I'll be glad to serve.  At that point, I hadn't
practiced with Charlie Gaines in ten years.
THE COURT:  How long did you practice with him?

MR. DOUGLAS:  About six years from 1987 to 1993. And I haven't practiced with him in ten years. So, my point is, I mean I was certainly aware of it to begin with but I also was aware of the way to resolve it.

. . . .

MR. PEARSON:  Your Honor, that's correct what he said. Only Ms. Sparks should be a representative of the settlement class.

MR. MCFADDEN:  And Ms. Sparks is the only one of the three class representatives who now represents the charge card. And I believe the case law is that if a class representative becomes ineligible, for whatever reason, there may be substitute class representatives subject, of course, to non solicitation rules.

THE COURT:  Subject to what?

MR. MCFADDEN:  Non solicitation rules. You can't go out and solicit people for it and I'll let Mr. Pearson address that issue.

. . . .

THE COURT:  Was this $10,000.00, was that to be out of the total 4.1?

MR. PEARSON:  Yes, Your Honor, it would come out of the settlement fund.

. . . .

THE COURT:  Do the lawyers agree with that?

MR. PEARSON:  Your Honor, I believe that the average class recovery in the settlement, if it's approved, it depends on the amount of attorneys' fees awarded because that's going to come out of it. If the full amount of attorneys' fees is awarded, the average recovery, not including interest, because interest is going to accrue on the settlement fund, I believe would be 43 cents.

One thing for the Court to keep in mind is that the claims themselves are very small. We're talking about claims of about $2.50 each on the average. So, I mean, that's what you have in class actions like this. You're dealing with very small claims in the aggregate.

THE COURT:  Does everybody agree that we're talking about an average of 43 cents? Okay. All right.

. . . .

THE COURT:  Let me ask you this question.  How does
it happen to be that we're talking about one of the class
representatives in this case getting a charge made of $75.00
which they thought was improper and yet other class members may
get 43 cents or less?  Because if the average is 43 cents, I'm
assuming some of it is going to be less.

MR. MCFADDEN:  I don't want to wade out into
quicksand without an anchor but...

THE COURT:  Well, you're the attorney in the case.

MR. MCFADDEN:  I am.  And I want to ask Mr. Pearson
to explain some of the details of that if I do not do it
adequately.  But, as I understand it, Ms. Abbott's was a credit
card charge and that was a late fee or finance charge.  And the
card we're talking about in this case isn't -- the California
case has been settled, would be the charge cards.

THE COURT:  Well, let me get it straight.  I assume
that Ms. Abbott would not have any basis for representing any
class in this case other than whatever kind of card she had; is
that correct?

MR. MCFADDEN:  That's correct.

THE COURT:  All right.  What kind of card did she
have?

MR. MCFADDEN:  She had a credit card.

THE COURT:  Credit card.  Now, do we purport to have
some class in this case other than credit card?

MR. MCFADDEN:  There were charge cards.  When the
case was filed, it covered charge cards and credit cards.

THE COURT:  How could she be a representative as a
charge card holder when she didn't have a charge card?

MR. MCFADDEN:  She represented a credit card holder
but the definition of the class of people who held credit cards
and it went on with others.

THE COURT:  But what I'm saying is, if she didn't
have a charge card, how could she represent herself to the
Court as being an appropriate representative of a charge card
holder?

MR. DOUGLAS:  Your Honor?

THE COURT:  I'm asking this gentleman a question.

MR. MCFADDEN:  She undertook to represent all
American Express cardholders, credit card, charge cards.

THE COURT:  Even though you say now she can't
represent them.

MR. MCFADDEN:  Because the class in California has

taken the credits card out.  The credit card holders, as I
understand it.
THE COURT:   Well, she's never been a charge card
holder, has she?
MR. MCFADDEN:   Not to my knowledge.

. . . .

THE COURT:   Answer this question for me.  If Ms.
Abbott was not a charge card holder, how can she represent
charge card holders?
MR. PEARSON:   She can't, Your Honor.

. . . .

MR. PEARSON:   Your Honor, it is American Express's
position that the only person who ought to be certified as a
representative of this settlement class is Ms. Sparks.  She was
added at our insistence.
THE COURT:   As a charge card holder?
MR. PEARSON:   Yes.  Because she has a charge card

. . . .

THE COURT:   I understand that.  I've told you all
what I've said.  I am not going to certify this class with Ms.
Sparks as a representative and you both agree that the other
two shouldn't be representatives.  Does everybody agree the
other two shouldn't be representatives and you're asking me to
certify the class based on a representative who purported to be
named the very same day the settlement was filed?  I'm not
going to certify the class.

. . . .

I understand that I am here today and one of the
preliminary issues that you all have asked me to address is
whether or not I will give preliminary approval of certifying a
class in a case represented by Mr. Douglas and whereby Ms.
Sparks purports to be the only class representative.  Is that
what I'm asked to do?
MR. PEARSON:   Yes, Your Honor.

. . . .

MR. MCFADDEN:   The only question I would have, if the Court please, is that I do not understand, leaving aside the conflict issue and the timeliness issue, why Ms. Sparks is not an adequate representative for the class?

THE COURT:   Because she came in as a purported class representative on the very same day that you filed the settlement agreement.

MR. MCFADDEN:   I do not understand that to be a fatal flaw.  It is in this case but, I mean, as a general rule, the case law --

THE COURT:  And I'll give you another reason.  She says her lawyer is Mr. Douglas, not you, not this gentleman over here, but Mr. Douglas.